**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

---

| | |
|---|---|
| In re:<br>JON C. LEARY<br><br>      DEBTOR. | Chapter 7<br>Case No. 15-20377 (JAM) |

---

| | |
|---|---|
| JAMES BERMAN, CHAPTER 7 TRUSTEE<br>FOR THE ESTATE OF<br>MICHAEL S. GOLDBERG, LLC and<br>MICHAEL S. GOLDBERG,<br><br>      PLAINTIFF<br><br>vs.<br><br>JON C. LEARY,<br><br>      DEFENDANT. | Adv. Pro. No. 15-02039 (JAM)<br><br><br><br>ECF No. 1 |

---

**APPEARANCES**

John L. Cesaroni, Esq.                               Attorney for the Plaintiff
Zeisler & Zeisler PC
10 Middle Street
Bridgeport, CT 06604

Jon C. Leary, Esq.                                         *Pro Se* Defendant
Law Offices of Jon C. Leary & Assoc, LLC
675 Berlin Tpke
Berlin, CT 06037

**MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE**
**DISCHARGEABILITY OF DEBT**

Julie A. Manning, Chief United States Bankruptcy Judge

**I.**    **Introduction**

On October 11 and 25, 2017, a trial was held on the complaint (the "Complaint"), filed

by James Berman, the Chapter 7 Trustee (the "Plaintiff"). The Complaint seeks to have the debt

evidenced by a certain stipulated judgment (the "Stipulated Judgment"),[1] entered against Jon C. Leary (the "Defendant"), in the amount of $1,189,250.00, declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).  The Plaintiff alleges that the Stipulated Judgment debt arises out of the Defendant's fraudulent activities in connection with a Ponzi scheme operated by Michael S. Goldberg (the "Goldberg Scheme"), and is therefore nondischargeable based on the Defendant's "actual fraud" and "willful and malicious conduct".[2]  The allegations in the Complaint are predicated upon the Amended Proposed Findings of Facts and Conclusions of Law issued by this Court in the Goldberg Adversary Proceeding (the "Amended Findings"),[3] which were accepted by the United States District Court for the District of Connecticut with minor exceptions not relevant here (the "District Court Order").[4]  Each party called witnesses and introduced exhibits during trial.[5]  For the reasons that follow, judgment will enter in favor of the Plaintiff and against the Defendant.

**II.    Jurisdiction**

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.  The instant action is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(I).

---

[1] The Stipulated Judgment was entered in an adversary proceeding entitled *Berman v. Michael S. Goldberg, et al.*, Adv. Proc. No. 10-2082  (the "Goldberg Adversary Proceeding"), brought in the Chapter 7 bankruptcy case of *In re: Michael S. Goldberg et al.*, Case No. 09-23370.

[2] The Plaintiff is not pursuing his First and Third Claims for Relief, and is only seeking relief under the Second Claim and Fourth Claims for Relief.  Plaintiff's Post-Trial Brief at 2, n.1 (ECF No. 81).

[3] The Amended Findings were issued by the Honorable Albert S. Dabrowski in the Goldberg Adversary Proceeding on May 11, 2015 (Adv. Pro. No. 10-2082, ECF No. 726).

[4] The District Court Order was entered on September 27, 2017, in the Goldberg Adversary Proceeding (ECF No. 815).

[5] The exhibits introduced and admitted during trial in this adversary proceeding are hereinafter referred to as "Plaintiff's Exh." or "Defendant's Exh.".

### III. Findings of Fact and Conclusions of Law

Pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7052, the following are the Court's findings of fact and conclusions of law:

### A. **FINDINGS OF FACT**

#### The Goldberg Scheme

1. For a period of about twelve years, Michael S. Goldberg ("Mr. Goldberg"), and Michael S. Goldberg, LLC, occasionally d/b/a Acquisitions Unlimited Group ("AUG"), which was controlled by Mr. Goldberg (collectively, the "Goldberg Debtors"), operated the Goldberg Scheme, a pure Ponzi scheme with no legitimate business purpose. *See* Pre-trial Stipulation dated October 10, 2017 (the "Stipulation," Adv. Proc. No. 15-02039, ECF No. 64), ¶ 1; Amended Findings p. 4.

2. The Goldberg Scheme did not involve any legitimate, actual business, or investment activity by the Goldberg Debtors. In fact, the only revenues derived in connection with the Goldberg Scheme were the moneys the Goldberg Debtors collected from a succession of new investors, whose money was then used to repay the earlier investors their original investment and guaranteed profits. Amended Findings pp. 4-5, 16; Plaintiff's Exh. D ¶ 11. The transfers by the Goldberg Debtors in furtherance of the Goldberg Scheme were made with actual fraudulent intent. Amended Findings pp. 62-63.

3. The Goldberg Scheme consisted of two types of business deals: 1) "Diamond Liquidation Deals"; 2) "Chase Asset Deals". Amended Findings p. 17.

4. The Diamond Liquidation Deals purported to give the Goldberg Debtors access to purchase diamonds at very low wholesale prices and pay investors a rate of return of approximately twenty percent (20%) every sixty (60) days, while purporting to grant investors a security interest in the diamonds. Plaintiff's Exh. D ¶ 3.

5. As evidenced by a fabricated "Chase Foreclosure Manifest," the Chase Asset Deals purportedly gave the Goldberg Debtors the contractual right to purchase foreclosed assets from Chase Manhattan Bank that the Goldberg Debtors would then sell, in prearranged sales, to large companies such as Bechtel Corporation and Swinerton Builders. Amended Findings p. 14. The Chase Asset Deals also provided that Chase Manhattan Bank was obligated to refund the full amount of the purchase price if the Goldberg Debtors were unable to re-sell the acquired assets to the ultimate buyer. Amended Findings p. 19; Plaintiff's Exh. D ¶ 7.

6. In his contracts with the investors in the Chase Asset Deals (the "Chase Contract(s)"),[6] Mr. Goldberg pretended to use the investment funds to buy foreclosed or seized properties for resale and to give investors back their initial investment plus a 20% profit margin. The Chase Contracts were characterized to be between Mr. Goldberg representing AUG and the individually named investors. Amended Findings p. 15.

7. The Chase Contracts were generally for a period of 90 days, but many investors reinvested all of the proceeds from the earlier investment so that the effective annual returns would be substantially in excess of 100% from compounded profits. In many of the Chase Contracts, Mr. Goldberg represented that *he*, not the investor, would be responsible for paying

---

[6] The Amended Findings note that the documents concerning the Chase Asset Deals are "ungrammatical, confusing, and generally unprofessionaly prepared" and "do[] not appear to be professionally drafted." Amended Findings at pp. 15, 66; Plaintiff's Exh. J, at 100:18-101:8.

any income tax owed by the investors on the profits generated (emphasis added). Amended Findings p. 16.

8.      As word of these high returns on the purportedly risk and tax-free investments spread, an increasing number of investors (together, the "Sub-investors"), wanted in on the Goldberg Scheme. This increased investment activity was largely attributable to the Goldberg Debtors' "feeders" such as the Defendant's client, Edward Malley ("Mr. Malley"). These "feeders" had significant financial incentive to bring in potential investors to receive a percentage of the investment dollars they brought in and, in some instances, a finder's fee up to 10% on investments made by their investors. Amended Findings p. 17; Plaintiff's Exh. D ¶¶ 13-14.

9.      When major investors began demanding full payment on their investments, the Goldberg Debtors began making late payments while trying to find replacement investors. The late payments created increased concern among large investors. Amended Findings p. 17; Plaintiff's Exh. D ¶ 15.

10.     Ultimately, Mr. Goldberg was sued and his assets were frozen by a group of large investors whose contracts he never paid. In November 2009, Mr. Goldberg voluntarily turned himself in to the Federal Bureau of Investigation. Amended Findings p. 17; Plaintiff's Exh. D ¶ 16.

**The Defendant's Involvement in the Goldberg Scheme**

11.     The Defendant is an attorney and was the sole member of the law firm of Kablick & Leary, P.C. ("K&L"), at least as early as 1997. Transcript of the Trial held on October 11, 2017[7] ("Oct. 11 Tr.," ECF No. 74), at 24:19-24.

---

[7] The transcript of the trial in this adversary proceeding will hereinafter be referred to as Oct ___ Tr.

12. K&L is no longer operating. During the time that K&L was operating, it maintained an IOLTA Account (the "IOLTA Account'). Oct. 11 Tr. at 26:25-27:2.

13. The Defendant learned about the Goldberg Scheme through his friend and client of fourteen years, Mr. Malley. During the period of 2005 through 2009, Mr. Malley extensively invested in the Goldberg Scheme and worked as a "feeder," soliciting other persons to enter into financial transactions with him and the Goldberg Debtors. Amended Findings pp. 23-24; Oct. 11 Tr. at 43:11-20.

14. The Defendant was first shown a Chase Contract by Mr. Malley in 2005. The Defendant discovered and advised Mr. Malley that AUG was not registered either as a corporation or an LLC with the Office of the Connecticut Secretary of State. The Defendant also expressed concerns about the unprofessional manner in which the Chase Contract was drafted and its unusually high rates of return of 20% plus margin per quarter. Amended Findings pp. 15 n.17, 20; Oct. 11 Tr. at 34:14-35, 39:1-6, 40:7-24; Plaintiff's Exh. J at 97:10-100:13.

15. At some time between 2005 and 2006, the Defendant also expressed his concern to Mr. Malley about the Chase Contract's questionable representation that the Goldberg Debtors would pay Mr. Malley's taxes and advised Mr. Malley to pay his taxes himself. Amended Findings pp. 19-20; Oct. 11 Tr. at 38:5-15; Plaintiff's Exh. J at 99:1-21.

16. The Defendant also knew that Mr. Goldberg was not a professional investor, and in fact worked as a medical device salesman. Oct. 11 Tr. at 163:23-164:4.

17. At no time prior to making his first investments, nor at any time thereafter, did the Defendant inquire of Mr. Goldberg as to whether he had any licenses or permits that were necessary to run his businesses nor was he provided with a name of the Mr. Goldberg's alleged accountant. Amended Findings p. 67; Oct. 11 Tr. at 125:25-126:4, 164: 5-8.

18. Despite the signs of the fraudulent nature of the Goldberg Scheme, in April 2006, the Defendant invested $100,000.00 with Mr. Malley with the understanding that Mr. Malley would be investing the money with the Goldberg Debtors. The Defendant ultimately received a return on his investment of 20-25% per quarter in the total amount equal to what Mr. Malley received from the Goldberg Debtors, with Mr. Malley collecting no fee. Amended Findings pp. 20, 26; Oct. 11 Tr. at 43:21-25, 44:13-45:13.

19. The Defendant understood his repayment from Mr. Malley was dependent upon there actually being a profit on his investment with the Goldberg Debtors. Amended Findings p. 26.

20. The Defendant and Mr. Malley sometimes treated Sub-investors' money as loans directly to themselves. Each used the money for his own purpose, allowing their own funds to be invested longer with the Goldberg Debtors. Amended Findings p. 26. In one occasion, the money received from an acquaintance of the Defendant, Frank Mete, was divided up between the Defendant and Mr. Malley for their own use. Amended Findings p. 26, n.37.

21. The Defendant drafted materials soliciting the Sub-investors to invest in the Goldberg Scheme and invested money into the Goldberg Scheme on behalf of his cousins' Trust, the "Nick and Jenny Angelillo Trust". Amended Findings p. 24; Oct. 11 Tr. at 44:16-45:3, 51-52, 132:21-23; Plaintiff's Exhibit DD, FF, and HH.

22. Between January and February 2008, the Defendant prepared an opinion letter as part of the effort to convince Robert Gengras ("Mr. Gengras"), to invest in the Goldberg Scheme. Amended Findings p. 24. In the letter, the Defendant wrote that the investment was "operated by a limited liability company … in good standing under the laws of the State of Connecticut", despite his knowledge that AUC was not a registered LLC. The letter also falsely claimed that

7

Mr. Malley and Mr. Goldberg had been business partners in a private investment. Amended Findings p. 24.

23. Along with the opinion letter, the Defendant also prepared an information sheet that described the general nature of the Goldberg Scheme for Mr. Gengras. The information sheet contained many falsehoods, including that Mr. Malley was a partner in the Goldberg Scheme and that Mr. Malley and Mr. Goldberg had been "accepted as a certified vendor in connection with the New Orleans reconstruction, enabling the company to sell goods to certified contractors." Amended Findings pp. 24-25. Mr. Gengras, in a meeting with the Defendant and Mr. Malley, was told that "he could make a profit of three times his investment over a period of six months to a year." *Id*. However, Mr. Gengras decided not to invest with the Goldberg Debtors as such high returns promised with "all the secrecy and … no hard date, no clear-cut names, ranks, serial number" were "too cloudy" and "too shady." *Id*.

24. Throughout the period in which Mr. Malley worked as a "feeder" for the Goldberg Debtors, the Defendant also drafted promissory notes for most of Mr. Malley's investors (collectively, the "Malley Notes"). Amended Findings pp. 20, 23, 26-27; Plaintiff's Exh. J at 117:17.

25. The Malley Notes drafted by the Defendant were copied by other "feeders" such as Mr. LaBonte in drafting their own promissory notes with third parties. Amended Findings pp. 31, 33-34.

26. The Defendant was the only person who had control over the IOLTA Account. Between July 15, 2005 and September 16, 2008, the Defendant, at the direction of Mr. Malley, effectuated and oversaw the transfers of about $3,934,500.00 to the Goldberg Debtors through

the IOLTA Account. The transfers included investments by himself, Mr. Malley, and the Sub-investors solicited by Mr. Malley. Amended Findings p. 20; Oct. 11 Tr. at 27:3-29:16.

27. In 2008 and 2009, the Defendant withdrew nearly $1,200,000.00 from the Goldberg Scheme through his IOLTA Account and ultimately received a profit of over $1,000,000.00 on his investment. Plaintiff's Exh. J at 104:12-14, 114:23-116, 154-14, 158:12-14, 163:17-19, 166:3-6, 166:14-16; Oct. 11. Tr. at 84:4-7, 172:5-174:4.

28. Between about July 17, 2008 and November 4, 2009, the Defendant effectuated and oversaw the re-transfer of approximately $12,366,000.00 from the Goldberg Debtors to the IOLTA Account, which he then distributed to himself, Mr. Malley, and the Sub-investors. Amended Findings p. 21; Plaintiff's Exh. K at 187:23-188:4.

29. In August 2009, the Defendant sent an e-mail to his cousins stating he expected to receive payments for the Nick and Jenny Angelillo Trust funds the Defendant invested into the Goldberg Scheme and assured them that "the money is there and will be paid" without any basis to support such claim. Plaintiff's Exhibit HH.

30. By the Fall of 2008, the Defendant was sending e-mails to Mr. Goldberg expressing concern over the delay in payments and started pursuing substantial repayment of his investment. Amended Findings p. 34; Plaintiff's Exh. J at 165: 6-166:1; Plaintiff's Exh. K at 202:20-203:2.

31. The Defendant received fees for his accounting services rendered for Mr. Malley's investments with the Goldberg Debtors. Amended Findings p. 83; Oct. 11. Tr. at 84:4-7; Plaintiff's Exh. J at 114:23-116, 154:14, 158:12-14, 163:17-19, 166:3-6, 166:14-16.

32. On November 18, 2009, an involuntary Chapter 7 was filed against Mr. Goldberg. The Goldberg Adversary Proceeding was commenced in the Goldberg Chapter 7 case on May

14, 2010. The Defendant and K&L were among the more than thirty (30) named defendants in the Goldberg Adversary Proceeding. Amended Findings p. 3; Plaintiff's Exh. X.

33. The claims asserted against the Defendant and others in the Goldberg Adversary Proceeding included, but were not limited to, claims for intentional fraudulent transfers set forth in the Twelfth and Fourteenth Claims for Relief. Plaintiff's Exh. D.

34. A trial on the First, Second, Fourth, Sixth, Eighth, Tenth, Eleventh, Twelfth, and Fourteenth Claims for Relief in the Goldberg Adversary Proceeding was held on June 13, 14, 15, 22, and 23, 2011 (the "Trial"). Amended Findings p. 10.

35. On the first day of Trial, prior to the introduction of evidence, the Plaintiff reported that he had reached a settlement with the defendants Jon Leary (the Defendant in the instant adversary proceeding), Laura Leary, and K&L. The Defendant's counsel was present when the report was made on the record that the Defendant agreed to stipulate to the entry of a judgment against him in the amount of $1,189.250.00. Amended Findings p. 2, n. 1; Transcript of Trial held on June 13, 2011, in Goldberg Adversary Proceeding at p. 31 (ECF No. 417 in Adv. Pro. No. 10-2082).

36. The Defendant was called as a witness and testified at the Trial. Amended Findings p. 23; Transcript of Trial held on June 13, 2011, in Goldberg Adversary Proceeding at p. 134 (ECF No. 417 in Adv. Pro. No. 10-2082).

37. After the Trial was concluded, the Plaintiff and the Defendant filed the Stipulated Judgment on July 8, 2011. The Stipulated Judgment provided that a judgment enter against the Defendant in the amount of $1,189,250.00. Plaintiff's Exh. C.

38. On July 20, 2011, the Court "Approved and So Ordered" the Stipulated Judgment (ECF No. 442 in Adv. Pro. No. 10-2082).

39. On March 11, 2015, the Defendant filed his voluntary Chapter 7 case entitled *In re: Jon C. Leary*, Case No. 15-20377.

40. On March 31, 2015, Proposed Findings of Fact and Conclusions of Law were issued in the Goldberg Adversary Proceeding pursuant to Federal Rule of Bankruptcy Procedure 9033(d) (ECF No. 703 in Adv. Pro. No. 10-2082).

40. On May 11, 2015, the Amended Findings were issued in the Goldberg Adversary Proceeding which found in favor of the Plaintiff on, among others, the Twelfth and Fourteenth Claims for Relief. Amended Findings p. 95.

40. On August 18, 2015, the Plaintiff commenced this adversary proceeding against the Defendant.

41. On September 27, 2017, pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(d), the Amended Findings issued in the Goldberg Adversary Proceeding were accepted by the District Court. District Court Order p. 10; Amended Findings p. 95; Plaintiff's Exh. D ¶¶ 154-65, 174-80.

42. A trial was held in this adversary proceeding on October 11 and 25, 2017.

B. **CONCLUSIONS OF LAW**

   1. **Application of General Collateral Estoppel Standard**

"It is well settled that preclusion principles apply in bankruptcy proceedings." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006); *In re Thompson*, 511 B.R. 20, 24 (Bankr. D. Conn. 2014). As the Connecticut Supreme Court stated in *Cumberland Farms, Inc. v. Town of Groton*, 262 Conn. 45, 58 (2002), under Connecticut law "[i]ssue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is

essential to the judgment." The court in *Cumberland Farms* went on to further explain that, in Connecticut,

> . . . collateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered . . . If an issue has been determined, but the judgment is not dependent upon the determination of that issue, the parties may relitigate the issue in a subsequent action.

*Id*. at 58, n.17 (emphasis in original) (citing *Dowling v. Finley Associates, Inc.*, 248 Conn. 364, 373-74 (1999)).

Specifically, in cases "[w]here the debt in question is a judgment entered after a claim of fraud has been adjudicated, either party to a subsequent adversary proceeding on nondischargeability can invoke collateral estoppel to establish that the debt is or is not dischargeable under the relevant nondischargeability provision." G*iaimo v. DeTrano (In re DeTrano*), 326 F.3d 319, 322 (2d Cir. 2003).

The fraud and willful and malicious conduct claims asserted against the Defendant were issues and facts actually and necessarily determined by a valid and final judgment in the Goldberg Adversary Proceeding. Therefore, the Amended Findings and Stipulated Judgment are given the preclusive effect in this adversary proceeding.

### 2.   Count Two – "Actual Fraud" under § 523(a)(2)(A)

The fact that the Goldberg Scheme was a pure Ponzi scheme,[8] is undisputed. It is also undisputed that the transfers made to the Defendant were made with actual fraudulent intent

---

[8] The Defendant admitted that the Goldberg Debtors operated a pure Ponzi scheme in the Stipulation filed prior to trial in this adversary proceeding (ECF No. 64).

pursuant to the Ponzi scheme presumption. Findings of Fact ¶¶ 1-2; *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) ("It is now well recognized that the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors.") (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) ("[T]ransfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.")). But these undisputed facts do not establish that the Defendant committed actual fraud when he received the fraudulent transfers.

However, the undisputed facts in Amended Findings and in this adversary proceeding do establish that the Defendant acted to further the Goldberg Scheme. It is undisputed that the Defendant thought the returns promised by the Goldberg Debtors were too good to be true, that the tax-free nature of the investment was suspicious, that he advised Mr. Malley to pay his own taxes, and he knew that AUG was not a registered LLC. Findings of Fact ¶¶ 14-15 (citing Oct. 11 Tr. at 34:14-35, 39:1-6, 40:7-24). He also knew that Mr. Goldberg was not a professional investor and in fact worked as a medical device salesman. Findings of Fact ¶¶ 16-18 (citing Oct. 11 Tr. at 163:23-164:4); *In re World Vision*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002) (finding a broker who sold promissory notes in a Ponzi scheme did not act in good faith when he relied on promises made by a dishonest debtor and did not request or review any financial statements or perform independent research on the debtor or its notes).

It is undisputed that the Defendant played an essential role in continuing the Goldberg Scheme despite his concerns. For example, the Defendant drafted documents with significant falsehoods to solicit investors. Findings of Fact ¶¶ 21-23. The Malley Notes, which the Defendant also drafted, served as guidance for other feeders and facilitated the transfers of funds

between the Goldberg Debtors and the investors, including transfers to himself and Mr. Malley through his IOLTA account. Findings of Fact ¶¶ 21-28. The Defendant's actions allowed the Goldberg Scheme to continue. The fraudulent transfers he received from the Goldberg Debtors were part of the overall Goldberg Scheme, and the Defendant's actions to facilitate and further the Goldberg Scheme establish that the Defendant knew the scheme was fraudulent. *See In re World Vision*, 275 B.R. at 650 (holding that brokers did have knowledge of the debtor's Ponzi scheme and were acting to further the fraud when the brokers "took absolutely no action to determine if the debtor was a legitimate business" and sold the "debt instruments that allow[ed] a Ponzi scheme to continue").

During the trial, the Defendant introduced evidence in an attempt to support a claim that he acted in good faith and was not aware of the Goldberg Scheme. However, any good faith defense the Defendant may have had with regard to the fraudulent transfers was waived when he entered into the Stipulated Judgment in the Goldberg Adversary Proceeding. Despite the unambiguous waiver, the Defendant was allowed to introduce evidence of his claim of good faith during trial. However, none of the evidence the Defendant introduced was credible.

The collateral estoppel effect of the Amended Findings, the undisputed record of the Defendant's participation in furthering the fraud, and the decision of the United States Supreme Court in *Husky v. Ritz*, establish that the Stipulated Judgment debt was obtained by "actual fraud," and thus is not dischargeable under § 523(a)(2)(A). *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016).

In *Husky*, the Supreme Court held that the recipient of a fraudulent transfer who commits fraud with the requisite intent, can "obtain" assets "by" his or her participation in the fraud within the meaning § 523(a)(2)(A). *Husky v. Ritz*, 136 S. Ct. 1581 at 1589 ("But the recipient of

14

the transfer—who, with the requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her participation in the fraud.") (citing *McClellan* v. *Cantrell,* 217 F.3d 890 (7th Cir. 2000). "If the recipient later files for bankruptcy, any debts "traceable to" the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A)." *See id*. at 1589 (internal citations omitted). Alhough the Supreme Court noted that "such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy," that is precisely what happened in this case. *See id*.

The Defendant—the recipient of fraudulent transfers made by the Goldberg Debtors—"obtained" money "by" his participation in the Goldberg Scheme. *See Husky v. Ritz*, 136 S. Ct. 1581 at 1589. The Defendant filed his Chapter 7 case after stipulating to a judgment that the transfers he received were fraudulent transfers. Findings of Fact ¶¶ 35-38. Under *Husky*, because the Stipulated Judgment debt is traceable to the fraudulent transfers, and because it is undisputed that the Defendant participated in the furtherance of the Goldberg Scheme, the Defendant acted with the requisite intent and committed actual fraud. Therefore, the Stipulated Judgment debt is nondischargeable under § 523(a)(2)(A).[9] *See Husky v. Ritz,* 136 S. Ct. 1581; *Archer v. Warner*, 538 U.S. 314, 315 ("[T]he dischargeability provisions applies to all debts that "aris[e] out of" fraud.") (citing *Brown v. Felsen*, 442 U.S. 127, 99 S. Ct. 2205, 60 L.Ed.2d 767); *In re Boyd*, 322 B.R. 318, 324 (Bankr. N.D. Ohio. 2004) ("[D]ischarge exceptions to debts resulting from actual fraud…implement the long-standing policy that only those debts which are honestly incurred are entitled to the benefits of a bankruptcy discharge.").

---

[9] The Defendant alleges that the Plaintiff failed to establish that the Defendant made false representations that a creditor relied on to his or her detriment and thus failed to establish the nondischargeability of a debt under § 523(a)(2)(A). However, as the United States Supreme Court held in *Husky*, "actual fraud" under § 523(a)(2)(A) does not require a misrepresentation from a debtor to a creditor and fraudulent conveyances are not an inducement-based fraud. *See Husky v. Ritz*, 136 S. Ct. 1581 at 1587.

### 2. Count Four – "Willful and Malicious Conduct" under § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that an individual will not receive a discharge of a debt arising out of "…willful and malicious injury by the debtor to another entity or the property of another entity." The term "willful" within the meaning of § 523(a)(6) means "deliberate or intention." *See Kawaauhau v. Geiger*, 523 U.S. 57, 57, 118 S. Ct. 974, 974, 140 L. Ed. 2d 90 (1998) ("[N]ondischargeability [under § 523(a)(6)] takes a deliberate or intentional injury.") (emphasis omitted); *In re Stelluti*, 94 F.3d 84, 87-88 (2d Cir. 1996) (citing *In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1995) ("[W]illful means deliberate or intentional.")). Term "malicious" within the meaning of discharge exception under § 523(a)(6) means "wrongful and without just cause or excuse, even in absence of personal hatred, spite, or ill-will." *Parris v. Delaney (In re Delaney)*, 504 B.R. 738, 749 (Bankr. D. Conn. 2014) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The 'willful and malicious' nature of the injury may be proved at trial from all the facts and circumstances." *See In re Marcella*, 463 B.R. 212, 219 (Bankr. D. Conn. 2011) (citing *In re Picard*, 339 B.R. 542, 555 n. 11 (Bankr. D. Conn. 2006)).

In this case, the evidence establishes that the Defendant's actions were deliberate and intended to further the Goldberg Scheme. As set forth above, despite the red flags, the Defendant played an essential role in continuing the Goldberg Scheme. It is undisputed that the Defendant drafted documents with significant falsehoods to solicit investors. Findings of Fact ¶¶ 21-25. Furthermore, the Defendant facilitated the transfers of funds between the Goldberg Debtors and the investors through the IOLTA account. Findings of Fact ¶¶ 26-28. Therefore, under these circumstances, the Court concludes that the Defendant's actions were deliberate and intentional, and thus "willful" under § 523(a)(6). *See In re Walker*, 48 F.3d 1161 (11th Cir.

1995) (quoting *In re Ikner*, 883 F.2d 986 (11th Cir. 1989) ("[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.").

Likewise, the circumstances under which the Defendant acted to further the Goldberg Scheme establish his conduct was malicious. *See In re Marcella*, 463 B.R. at 221 ("Implied malice may be demonstrated by the acts and conduct of the debtor in the context of the surrounding circumstances.") (citing *In re Picard*, 338 B.R. 542 at 553). The Defendant knowingly participated in the Goldberg Scheme and engaged in wrongful and fraudulent conduct by drafting investment materials containing substantial misinformation, funneling funds between the Goldberg Debtors and the Sub-investors to continue the Ponzi scheme, and transferring $1,200,000.00 to himself through the IOLTA Account after concerns that the scheme was no longer viable. Findings of Fact ¶¶ 14-31; *In re Marcella*, 463 B.R. at 222 ("Debtor acts with malice … by intending or fully expecting to harm the economic interests of creditor."); *In re Felton*, 197 B.R. 881, 890 (N.D. Cal. 1996) (affirming the bankruptcy court's finding that debtor's inducement of 69-year-old mother to cosign children's loans was "willful and malicious" where debtor knew that children would default and the mother's house would be claim as collateral); *In re Powell*, 95 B.R. 236, 239 (Bankr. S. D. Fla. 1989), aff'd 108 B.R. 343 (S.D. Fla. 1989), aff'd sub nom. *Powell v. Bear, Stearns & Co.*, 914 F.2d 268 (11th Cir. 1990) (finding that the debtor's willful misstatements in connection with a fraudulent scheme to induce the creditor into purchasing stock on his behalf which the debtor had no ability to pay was "willful and malicious injury" under § 523(a)(6)). Therefore, the Court finds that the Defendant's actions in furtherance of the Goldberg Scheme constitute "willful and malicious

injury" under § 523(a)(6) and that the Stipulated Judgment debt arising out of the Defendant's willful and malicious injury is nondischargeable.

## IV.    Conclusion

For the reasons set forth above, judgment will enter in favor of the Plaintiff. The Stipulated Judgment debt in the amount of $1,189,250.00 is deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

Dated at Bridgeport, Connecticut this 12th day of April, 2019.

*Julie A. Manning*
Chief United States Bankruptcy Judge
District of Connecticut